Cheryl KLINGER; Linda Lange;
Gweniver Lay; Stacy Finn,
Appellees,

v.

DEPARTMENT OF CORRECTIONS; Harold Clarke, Director; Larry A. Tewes, Assistant Director, Nebraska Department of Correctional Services and former Acting Superintendent of Nebraska Center for Women; Victor Lofgreen, Former Superintendent of Nebraska Center for Women; Larry Wayne, Superintendent of Nebraska Center for Women; Judith Danielson, Psychologist, Nebraska Center for Women; Margaret Wehland, Medical Nurse, Nebraska Center for Women, Appellants.

No. 93–2928.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 16, 1994.

Aug. 10, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 7, 1994.*

---

* Arnold, Chief Judge, McMillian and Beam, Circuit Judges, would grant the suggestion for rehearing en banc.

Laurie Smith Camp, Asst. Atty. Gen., Lincoln, NE, argued, for appellants.

Gail S. Perry, Lincoln, NE, argued, for appellees.

Before McMILLIAN, WOLLMAN, and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

This is an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). We are asked to determine whether the district court properly applied the law in finding present and past

administrators of the Nebraska Department of Correctional Services (Department) liable for violating the equal protection rights of female inmates (plaintiffs) in the Department's prison system as to the provision of prison programs and services in this class action suit. Because we hold that the plaintiffs are not similarly situated to male inmates at Nebraska State Penitentiary (NSP) for purposes of prison programs and services, we reverse the district court's order and dismiss the plaintiffs' equal protection claim.

## I. BACKGROUND

The Department is a Nebraska state agency that runs the state's ten correctional facilities. Of the ten facilities, Nebraska Center for Women (NCW) is the only one that exclusively houses women. Besides NCW, the Department runs four facilities that house only men: NSP, the Lincoln Correctional Center, the Omaha Correctional Center, and the Hastings Correctional Center. The Department also operates two institutions that house both men and women and three institutions for juvenile offenders.

In July 1988, four NCW inmates filed a pro se complaint in district court, alleging that the Department was treating male inmates more favorably than female inmates with regard to prison programs and services. In October 1988, the district court appointed counsel to represent the pro se inmates. Counsel filed an amended complaint alleging equal protection violations and a motion for class certification. The district court certified a plaintiff class including "all women who were NCW inmates at any time on or after January 1, 1988, through the conclusion of th[e] case."

In April 1989, the magistrate judge warned the plaintiffs to specify each male institution to which they sought to compare programs and services. In June 1989, the plaintiffs filed a second amended complaint, alleging that they receive inferior programs and services in certain areas as compared to NSP inmates. Because of the way that the plaintiffs framed the second amended complaint, discovery proceeded with NSP as the only comparison institution. In May 1990, after months of discovery, the plaintiffs sought leave to file a third amended complaint broadening the comparison group and alleging that NCW inmates were similarly situated for purposes of prison programs and services to *all* male inmates in the Nebraska system. The magistrate judge denied the plaintiffs' motion, concluding that broadening the comparison group at such a late date would prejudice the defendants because twenty-nine depositions involving both lay and expert witnesses had already been taken and the witnesses were asked to compare conditions at NCW only to those at NSP. The magistrate judge also reasoned that the plaintiffs had been warned in April 1989 to specify to which institutions they wanted to compare programs and services at NCW. The district court agreed with the magistrate judge and thus limited the plaintiffs' comparison group to NSP.

The third amended complaint stated several claims. For purposes of this appeal, the only relevant claim is the plaintiffs' claim under 42 U.S.C. § 1983 that the Department discriminates against the plaintiffs on the basis of sex as to prison programs and services in violation of the Fourteenth Amendment's Equal Protection Clause. Specifically, the plaintiffs alleged that, compared to male inmates at NSP, inmates at NCW receive inferior "vocational, educational and employment opportunities and programs, rehabilitation programs, exercise and recreational programs and facilities, visiting privileges, legal programs, medical, dental and psychological services, and treatment associated with security classifications." I App. at 60. The plaintiffs named as defendants on the equal protection claim are Frank Gunter, former director of the Department; Harold Clarke, current director of the Department; Victor Lofgreen, former superintendent of NCW; Larry Tewes, former superintendent of NCW; and Larry Wayne, current superintendent of NCW.

After the plaintiffs filed their third amended complaint, the defendants moved for summary judgment. The district court granted partial summary judgment to the defendants, but found that there were genuine issues of material fact as to several of the plaintiffs' claims, including the equal protection claim.

The district court bifurcated the trial into a liability phase and a remedial phase. The liability phase proceeded to trial on the plaintiffs' surviving claims in July 1992. After a four-week trial, the district court found Gunter and Clarke liable [1] for violating the plaintiffs' equal protection rights in over a dozen different ways relating to the programs in the challenged areas.

In June 1993, the district court certified three controlling questions of law relating to the plaintiffs' equal protection claim under 28 U.S.C. § 1292(b). The controlling questions of law include:

[1]. Did the court correctly determine that the female inmates at the Nebraska Center for Women are similarly situated to the male inmates at the Nebraska State Penitentiary for purposes of the Equal Protection Clause regarding the programs and services challenged by the plaintiffs?

[2]. Did the court correctly determine that "heightened scrutiny" as opposed to "rational basis" scrutiny is the proper level of scrutiny to judge the equal protection claims of the female inmates at the Nebraska Center for Women and, if so, did the court correctly apply "heightened scrutiny" to the facts?

[3]. Did the court correctly conclude that the Equal Protection Clause requires the State of Nebraska to provide programs and services to female inmates at the Nebraska which are "substantially equivalent" to or in parity with the programs and services provided male inmates at the Nebraska State Penitentiary and, if so, did the court correctly apply such concepts to the facts?

II App. at 512–13. We granted the defendants permission to file an interlocutory appeal under § 1292(b).

## II. DISCUSSION

The defendants argue that the district court committed several legal errors in concluding that they are liable for violating the plaintiffs' equal protection rights. Specifical-

ly, they assert that the district court erred (1) in finding that the plaintiffs and NSP inmates are similarly situated for purposes of prison programs and services, (2) in concluding that heightened scrutiny rather than deferential review under *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), applied to the plaintiffs' claim, and (3) in comparing programs at NSP and NCW on a program-by-program basis. We agree with the defendants that the plaintiffs and NSP inmates are not similarly situated for purposes of prison programs and services. Thus, we reverse the district court's order finding the defendants liable and dismiss the plaintiffs' equal protection claim.

### A. The District Court's Opinion

We begin by summarizing the district court's opinion. The court began by discussing whether to apply *Turner* rational basis review or heightened scrutiny to the plaintiffs' equal protection claim. It concluded that heightened scrutiny was the proper test because "there is no doubt that women are incarcerated at NCW because of their gender alone and not for some other reason." *Klinger v. Nebraska Dep't of Correctional Servs.*, 824 F.Supp. 1374, 1388 (D.Neb.1993).

The court then determined that the plaintiffs are similarly situated to male inmates at NSP for purposes of prison programs and services. First, it reasoned that the plaintiffs and NSP inmates are both prisoners incarcerated in Nebraska institutions. Second, the court found that comparing programs at the two institutions was appropriate because the Department classified NSP and NCW inmates as "roughly comparable" as to custody levels. Third, the court reasoned that the purposes of incarceration were the same for men and women. Fourth, the court distinguished *Timm v. Gunter*, 917 F.2d 1093, 1103 (8th Cir.1990), *cert. denied*, 501 U.S. 1209, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991), in which we held that NSP and NCW were not similarly situated for purposes of privacy rights because of different security

---

**1.** The court found Gunter liable in his personal capacity and Clarke liable in his official capacity. It also concluded, however, that Lofgreen, Tewes, and Wayne were not liable for the equal

protection violations. For convenience, the opinion will refer to Gunter and Clarke as "the defendants."

concerns at the two institutions. Finally, the court concluded that the appropriate place to take into account differences between NSP and NCW was at the heightened scrutiny stage, and not at the similarly situated stage.

The court proceeded to compare programs and services at NCW with those at NSP on a program-by-program basis. It generally concluded that invidious sex discrimination existed wherever the plaintiffs receive a substantively inferior program or service as compared to NSP inmates, rejecting the reasons that the defendants proffered for the differences in treatment. The court found that the plaintiffs suffered a "substantial burden" as to some nineteen programs and services and that the defendants had failed to show that such differing treatment was justified under heightened scrutiny. Thus, the court concluded, the defendants violated the plaintiffs' equal protection rights.

### B. Equal Protection Analysis

The Equal Protection Clause generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Dissimilar treatment of dissimilarly situated persons does not violate equal protection. *See Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.,* 21 F.3d 237, 242 (8th Cir.1994). Thus, the first step in an equal protection case is determining whether the plaintiff has demonstrated that she was treated differently than others who were similarly situated to her. *See, e.g., Samaad v. City of Dallas,* 940 F.2d 925, 940–41 (5th Cir.1991). Absent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim. *See id.* at 941 (holding that black residents failed to state an equal protection claim where they did not allege the existence of a similarly situated group of white residents who were treated differently). Thus, before we may reach the merits of their equal protection claim, we must determine if the plaintiffs and NSP inmates are similarly situated.

The similarly situated inquiry focuses on whether the plaintiffs are similarly situated to another group for purposes of the challenged government action. *See More v. Farrier,* 984 F.2d 269, 271 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 74, 126 L.Ed.2d 43 (1993). Thus, because the similarly situated inquiry depends on what government action the plaintiffs are challenging, we must first precisely define the plaintiffs' claim. The third amended complaint alleges that the Department provides the plaintiffs with programs and services inferior to those that NSP inmates receive in twelve different areas. It does not allege, however, that NCW receives inadequate funding as compared to NSP or that the defendants are responsible for the amount of funding that NCW receives. Thus, the plaintiffs do not claim that their allegedly inferior programs are a result of discriminatory funding.[2] Because the complaint thus acknowledges that NCW receives sufficient funding, the plaintiffs' claim must be that the Department made poor decisions at NCW with the limited resources available as compared to the decisions it made at NSP. In other words, the plaintiffs in essence claim that the Constitution requires the Department to allocate resources and select programming at NCW like it allocates resources and selects programming at NSP.

In light of the plaintiffs' claim, we hold that NCW inmates and NSP inmates are not similarly situated for purposes of prison programs and services. First, it is important to understand how different NSP and NCW are. Among Nebraska's five single-sex prisons, NCW houses the fewest inmates. NSP, in contrast, houses about six times as many inmates as NCW. Moreover, the average length of inmate stay at NSP is two to three times as long as it is at NCW. On Nebraska's security scale of one to four, with level four being the least secure, NCW is classified as a level four institution, while NSP is classified as a level two institution. The plaintiffs' witnesses also testified at trial that female inmates as a class have special

---

**2.** Nor could they make such a claim. Nebraska spent more money per capita on NCW than any other adult prison in its system. *See* IV App. at 739.

characteristics distinguishing them from male inmates, ranging from the fact that they are more likely to be single parents with primary responsibility for child rearing to the fact that they are more likely to be sexual or physical abuse victims. Male inmates, in contrast, are more likely to be violent and predatory than female inmates.

Thus, the programs at NSP and NCW reflect separate sets of decisions based on entirely different circumstances. When determining programming at an individual prison under the restrictions of a limited budget, prison officials must make hard choices. They must balance many considerations, ranging from the characteristics of the inmates at that prison to the size of the institution, to determine the optimal mix of programs and services. *See Turner*, 482 U.S. at 84–85, 107 S.Ct. at 2259–60. Program priorities thus differ from prison to prison, depending on innumerable variables that officials must take into account. In short, NSP and NCW are different institutions with different inmates each operating with limited resources to fulfill different specific needs. *See Timm*, 917 F.2d at 1103. Thus, whether NCW lacks one program that NSP has proves almost nothing.

■ Indeed, as between any two prisons, there will always be stark differences in programming. Assuming that all prisons start with adequate yet limited funding—as we must here, because the plaintiffs do not claim that NCW is subject to discriminatory funding—officials will calibrate programming differently in each prison, emphasizing in one prison programs that they de-emphasize in others. Thus, female inmates can always point out certain ways in which male prisons are "better" than theirs, just as male inmates can always point out *other* ways in which female prisons are "better" than theirs.[3] *See Bills v. Dahm*, No. 4:CV93–3108 (D.Neb. Jan. 12, 1994), *appeal docketed*, No. 94–1300 (8th Cir. Feb. 2, 1994) (appeal of district court decision denying qualified immunity to Nebraska prison officials in male inmate's action alleging that he was denied equal pro-

tection because NCW inmates are allowed overnight visits from their children but inmates at Lincoln Correctional Center are not) (argued June 6, 1994). Comparing an isolated number of selected programs at NSP and NCW is thus a futile exercise. At bottom, using an inter-prison program comparison to analyze equal protection claims improperly assumes that the Constitution requires all prisons to have similar program priorities and to allocate resources similarly. Although the comparison between programs at NSP and those at NCW is not legally irrelevant, it is sufficiently attenuated that we believe it taints an analysis of whether the Department violated the plaintiffs' equal protection rights. *Cf. Timm*, 917 F.2d at 1103 (holding that NSP and NCW are not similarly situated for purposes of privacy rights because of differences in security concerns between the two prisons).

■ Moreover, the Supreme Court's *Turner* decision counsels against holding that the plaintiffs and NSP inmates are similarly situated for purposes of prison programs and services. The plaintiffs' claim challenges the day-to-day administrative decisions of prison officials. In *Turner*, the Court explained that " 'courts are ill equipped to deal with the increasingly urgent problems of prison administration.' " 482 U.S. at 84, 107 S.Ct. at 2259 (quoting *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)). Because courts have little expertise in the "inordinately difficult" task of running prisons, courts should accord a high degree of deference to prison authorities. *Id.* at 85, 107 S.Ct. at 2259–60. Subjecting prison officials' decisions to close scrutiny "distort[s] the decisionmaking process" and "seriously hamper[s] [officials'] ability to . . . adopt innovative solutions to the intractable problems of prison administration." *Id.* at 89, 107 S.Ct. at 2262. Analyzing this case using a program comparison between NSP and NCW, however, places dozens of substantive administrative prison decisions under close judicial scrutiny and subjects them to after-the-fact second-guessing by a federal

---

3. Indeed, the district court found that in several of the areas that the plaintiffs challenged, NCW inmates had better programs than NSP inmates.

*See, e.g., Klinger*, 824 F.Supp. at 1418 (daily access to physicians), 1423–24 (substance abuse treatment), 1430 (child visitation programs).

court. Moreover, comparing programs at NSP and NCW places the burden on prison officials to explain decisions that resulted from the complicated interplay of many variables—some of which were beyond their control—and thus are not susceptible to ready explanation.

Finally, prison officials would be far less willing to experiment and innovate with programs at an individual institution knowing that a federal court could impose liability on the basis of a program comparison. Indeed, inmates would suffer because officials would likely provide each institution with the bare constitutional minimum of programs and services to avoid the threat of equal protection liability. *Cf. Bills,* slip op. at 1–3. Thus, comparing programs at NSP and NCW results in precisely the type of federal court interference with and "micro-management" of prisons that *Turner* condemned.

 Thus, we hold that, as a matter of law, the plaintiffs and NSP inmates are not similarly situated for purposes of prison programs and services. Differences between challenged programs at the two prisons are virtually irrelevant because so many variables affect the mix of programming that an institution has. Further, comparing programs improperly results in federal court scrutiny of prison officials' substantive administrative decisions. In short, comparing programs at NSP to those at NCW is like the proverbial comparison of apples to oranges. Thus, as their complaint is framed, the plaintiffs have failed to make the requisite threshold showing that they are similarly

situated to the group that they claim receives favorable treatment. For this reason, the plaintiffs have not suffered an equal protection violation because their programs in twelve areas are allegedly inferior to those that male inmates at NSP receive. *See Barket, Levy & Fine, Inc.,* 21 F.3d at 242 (" 'Different treatment of dissimilarly situated persons does not violate the equal protection clause[.]' " (quoting *E & T Realty v. Strickland,* 830 F.2d 1107, 1109 (11th Cir. 1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988))).[4]

 The dissent would hold that NSP inmates and NCW inmates are similarly situated for purposes of prison programs and services and that an equal protection violation exists wherever NCW receives an inferior program as compared to NSP. Even assuming the inmates are similarly situated, however, that is merely the beginning of the analysis. A fundamental principle of equal protection is that the Constitution only prohibits intentional or purposeful discrimination by the state. *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293–94, 60 L.Ed.2d 870 (1979). To prevail on a sex discrimination claim, a plaintiff must show that the state discriminated against her because of her sex. *Id.* at 279, 99 S.Ct. at 2296. Both the district court and the dissent make the erroneous assumption that any inferior programs that NCW inmates receive are necessarily a result of intentional sex discrimination.

For instance, if the Department selected vocational programs at men's prisons based on inmate surveys, but unilaterally selected such programs at NCW without consulting the inmates at all, NCW inmates would be able to make the requisite threshold showing that they were treated differently than others similarly situated. Thus, male and female inmates *are* similarly situated at the beginning of the decisionmaking process, where infinite intervening variables have not yet excessively tainted the comparison between prisons nor are officials' substantive administrative decisions yet at issue. We need not elaborate on the details of pleading and proving such a claim here. Suffice it to say that the plaintiffs have not pleaded such a claim.

---

4. That the plaintiffs and NSP inmates are not similarly situated for purposes of prison programs and services does not mean that female inmates are foreclosed from bringing equal protection claims challenging the state's treatment of them. As it is set forth in the complaint, the plaintiffs' claim here requires an inappropriate comparison of programs at NSP and NCW in twelve different areas. Some comparisons of the Department's respective treatment of male and female inmates, however, are appropriate. For instance, male and female inmates are similarly situated *for purposes of the process* by which the Department makes programming decisions. That is, instead of alleging differences in programs between prisons, a proper equal protection claim may allege differences in the process by which program decisions were made at the prisons.

Indeed, the district court made no findings on whether the plaintiffs carried their burden of proving intentional discrimination nor did it mention that the plaintiffs carried this burden. Rather, the court generally shifted the burden to the defendants to justify differences in prison programming on sex-neutral grounds and thus *disprove* discriminatory purpose. *See, e.g., Klinger*, 824 F.Supp. at 1419 (holding that equal protection violation existed where NCW lacked 24–hour medical services even though defendants proffered evidence that neither the Hastings Correctional Center nor the Omaha Correctional Center—*two all-male institutions in the Nebraska system*—had such services either). The district court's analysis effectively relieved the plaintiffs of their burden of persuasion on the ultimate issue of discriminatory purpose.

■ Likewise, the dissent and the district court both erroneously assume that this is a case involving a facial gender classification. There is simply no Nebraska statute or policy that distinguishes on its face between men and women as to prison programs. Indeed, the statutes relating to programming in Nebraska prisons are *facially neutral*. *See* Neb.Rev.Stat. § 83–901 *et seq.* There is of course a facial classification in Nebraska prisons in that male and female inmates are segregated by institution, with the exception of the two integrated institutions. The plaintiffs, however, do not challenge this classification. The dissent and the district court apparently reason that if women are sent to NCW because of their sex that the programs they receive are necessarily based on their sex.

This conclusion is unwarranted. For example, NSP has 24–hour medical service available; two other all-male institutions and NCW lack 24–hour medical service. There is clearly no "facial gender classification" regarding 24–hour medical service where both male and female prisoners are in the group deprived of the program. Thus, determining whether the plaintiffs receive inferior programs because of their sex or for some other reason requires looking beyond the fact that female prisoners are segregated from men and examining the reasons behind the defendants' programming decisions. For this reason, *Feeney* controls and the district court erred in failing to make findings on discriminatory intent.

## III. CONCLUSION

For the foregoing reasons, we reverse the district court's order finding the defendants liable for violating the plaintiffs' equal protection rights and dismiss the plaintiffs' equal protection claim.[5]

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent. The majority opinion artificially manipulates the Equal Protection Clause requirement of "similarly situated" and misapplies Fourteenth Amendment standards at the expense of female inmates incarcerated at NCW.

The majority opinion errs in concluding that male inmates incarcerated at NSP are not similarly situated to female inmates incarcerated at NCW for purposes of comparing institutional programs and services.[1] On a general level, the female inmates at NCW and male inmates at NSP are similarly situated for purposes of comparing the programs and services offered to them because both groups of inmates are confined by the State of Nebraska as a result of a criminal conviction. More importantly, they are similarly situated because the State of Nebraska and the Department of Corrections view the purpose of incarceration to be the same for all inmates regardless of gender: to enable inmates to seek reform within the institution and rehabilitate themselves to function in society as law-abiding citizens. Irrespective of gender, the prison system strives to prevent revolving-door recidivism. A close and

---

5. In light of our holding, we need not address the defendants' claim that Gunter is entitled to qualified immunity, although we believe it may have some merit.

1. The challenged programs and services encompass employment and economic concerns, educational and vocational training courses, concerns regarding the law library, medical and dental services, recreational opportunities, and concerns regarding visitation.

critical nexus exists between inmate rehabilitation and the provision of recreational opportunities and educational and vocational training programs and services to inmates within the prison system. It is unquestionable, with respect to the goal of rehabilitation, that female inmates at NCW and male inmates at NSP are similarly situated for purposes of comparing programs and services.

Female inmates at NCW are also similarly situated to male inmates at NSP for purposes of programs and services because they are equally as capable of participating in, and benefitting from, the recreational, educational and vocational opportunities offered to their male counterparts. *See More v. Farrier*, 984 F.2d 269, 271 (8th Cir.1992) (concluding wheelchair-bound inmates were similarly situated to ambulatory inmates for purposes of challenging denial of in-cell cable television because they were as capable of participating in, and benefitting from, the challenged program). The female inmates incarcerated at NCW are for the most part poor, undereducated, and lack the vocational training necessary to become self-supporting. The female inmates' gender places them at the bottom of the list of the unemployed and unemployables in this country. In other words, gender itself will disadvantage the female inmates as they attempt to enter or re-enter the workforce. Clearly, their need for educational and vocational training to obtain employment and become self-sufficient upon release is equal to that of males at NSP, who are also in general poor, undereducated, and lack vocational training. All released ex-offenders, irrespective of gender, encounter enormous difficulty in securing employment. Plaintiffs are entitled to the same opportunity as their male counterparts to learn marketable skills which will enable them to obtain employment upon release from prison.

Further, the district court found that NCW and NSP house inmates with comparable custody classifications:

> [S]ince NCW spans the security continuum and houses maximum custody inmates, and since NSP also houses maximum custody inmates, it is likely that the court will be comparing populations, aside from gender, which are classified as roughly comparable

by the State of Nebraska. In this regard, since there is no segregation between minimum custody inmates and maximum custody inmates at NCW, minimum custody inmates receive the same type of treatment as maximum custody inmates. Thus, it is not inconsistent to treat both institutions as having roughly comparable populations. Stated another way, female minimum custody inmates are treated essentially the same as female maximum custody inmates. Therefore, if it is appropriate to compare institutions housing female maximum custody inmates with institutions housing male maximum custody inmates, then the existence of the lower custody status inmates at NCW is irrelevant.

*Klinger v. Nebraska Dep't of Corrections,* 824 F.Supp. 1374, 1389 (D.Neb.1993) (*Klinger* ).

Nonetheless, the majority opinion holds that "NCW inmates and NSP inmates are not similarly situated for purposes of prison programs and services" because of different characteristics of male and female inmates and different circumstances surrounding their incarceration. Maj. op. at 731–32. The reasons cited by the majority opinion for the purported dissimilarity of male and female inmates include factors such as the shorter average length of inmate stay at NCW (13 months) as compared to NSP (54 months). A close examination of the record belies using length of inmate stay as a ground for differentiating between NCW and NSP for purposes of comparing programs and services. *Regardless of length of stay,* male inmates at NSP, unlike their female counterparts at NCW, are afforded the opportunity to participate in a wide gamut of vocational programs and enroll in post-secondary educational courses that can ultimately lead to a college degree. As the district court concluded, "it is difficult to understand the rationale for denying females [these opportunities] based upon a factor that was not employed for males." *Klinger,* 824 F.Supp. at 1401. No evidence was presented that NSP provided the superior programs and services only to "long-time" male inmates or that, conversely, NSP's "short-time" male inmates did not benefit from the training. The

"length-of-stay" argument is further belief by the district court's observation that:

> the difference in "length of stay" between NCW inmates and "medium" custody NSP inmates was small. The "medium" custody male group at NSP was probably "most like" the females at NCW. For example, in June, 1990, (Ex. 1385), the data showed: (a) inmates staying 24 months or less: NSP (medium) 70.7% vs. NCW 82.4%; (b) inmates staying 18 months or less: NSP (medium) 61.5% vs. NCW 74.3%; (c) inmates staying 12 months or less: NSP (medium) 50.6% vs. NCW 66.9%. Even if one looks at the maximum custody inmates at NSP, one out of five inmates stayed 12 months or less. *Id.* Indeed, nearly 40% of the NSP maximum custody inmates stayed 24 months or less. Since college course work was offered to these male inmates regardless of "length of stay," it seems fair to conclude that "length of stay" was not a factor in offering college work at NSP.

*Id.*

The majority opinion also finds dissimilarity because "[a]mong Nebraska's five single-sex prisons, NCW houses the fewest inmates ... NSP, in contrast, houses about six times as many inmates as NCW." Maj. op. at 731. The majority opinion's analysis is driven by the fact that the Department is operating under "the restrictions of a limited budget ... and the difference ... [in] institution size" of NCW and NSP make them dissimilar for purposes of comparing programs and services. Maj. op. at 731–32.

In *Bukhari v. Hutto*, 487 F.Supp. 1162 (E.D.Va.1980) (*Bukhari*), the plaintiff argued that her conditions of confinement in an all-female prison were inferior to those of male inmates in an all-male institution. The court recognized that the defendants "must deal with the fiscal reality that providing for a wide range of programs for a smaller number of prisoners entails a greater cost." *Id.* at 1172. Nonetheless, the court opined that "such seemingly practical considerations may not be used to 'justify official inaction or unwillingness to operate a prison system in a constitutional manner.'" *Id.* (citations omitted); *see also Califano v. Goldfarb*, 430 U.S. 199, 217, 97 S.Ct. 1021, 1032, 51 L.Ed.2d 270 (1977) (savings in time, money and effort do not justify gender-based discrimination).

In *West v. Virginia Dep't of Corrections*, 847 F.Supp. 402 (W.D.Va.1994) (*West*), the plaintiff, a female inmate at the Virginia Correctional Center for Women, raised an equal protection clause challenge to the establishment of a pilot boot camp program, which offered academic education, vocational assessment and life skills training, at a male-only prison, while no such pilot program existed at the female-only prison. In response to the defendants' argument that the program in the men's prison was justified because of limited resources, and because problems were more pressing in male prisons, and it was more cost-effective to address those problems, the court held "[i]f defendants' argument were carried to its logical extension, then the same argument could be used to deny women inmates the opportunity for education, vocational training or rehabilitation. Surely such an inequitable distribution of resources is not contemplated by the Fourteenth Amendment." *Id.* at 407.

It is well-settled that financial hardship is not a defense to sex discrimination in prisons. *See Shapiro v. Thompson*, 394 U.S. 618, 633, 89 S.Ct. 1322, 1330–31, 22 L.Ed.2d 600 (1969) (while states have a valid interest in preserving the fiscal integrity of programs, it may not accomplish such a purpose by invidious distinctions between classes of citizens). Cost-driven differences in institution size and inmate length of stay do not constitutionally justify limiting NCW inmates' training to domestics and other "women's" occupations such as "clerical arts" and homemaking, providing inferior inmate pay, pre-employment training and prison law libraries, while denying them post-secondary education or vocational courses that could lead to a college degree or college credit, and providing NSP inmates with training in higher-paying, more technical, and more varied occupations, more sophisticated and accessible prison law libraries, and educational and vocational courses leading to attainment of a college degree or college credit.

"To be 'similarly situated,' groups need not be identical in makeup, they need only share

commonalities that merit similar treatment." *Betts v. McCaughtry,* 827 F.Supp. 1400, 1405 (W.D.Wis.1993). In the present case, female inmates at NCW do in fact "share commonalities" with male inmates at NSP that merit similar treatment in terms of their right and ability to receive educational and vocational programs and services. NCW inmates are equally as capable of participating in, and benefitting from, the academic, vocational and rehabilitative opportunities offered to the NSP inmates. NCW and NSP inmates are both incarcerated as the result of a criminal conviction, and the Department views the purpose of incarceration for both classes of inmates to be the same regardless of gender. Further, NCW and NSP reflect comparable custody classifications, and the record reveals absolutely no evidence that concerns for institutional security justify offering different programs and services at the respective institutions. "On the contrary, if anything, the relative lack of security concerns at NCW, compared with NSP, makes at least some of the differences in programs inexplicable if based upon security concerns." *Klinger,* 824 F.Supp. at 1390. Nonetheless, due to their smaller numbers, predominantly non-violent, non-predatory nature, and the fact that they are generally incarcerated for less serious offenses and for shorter time periods than their male counterparts, the majority opinion chooses to sanction constitutionally unequal treatment of female inmates at NCW and to neglect the rights guaranteed to them by the Equal Protection Clause of the Fourteenth Amendment. The fact of incarceration and the particular exigencies of prison administration cannot justify programs and services provided female inmates that are markedly inferior to those provided male inmates.

The majority opinion further confuses basic tenets of constitutional law in holding fatal to the plaintiffs' claim of gender discrimination the district court's failure to make "findings on whether the plaintiffs carried their burden of proving intentional discrimination" and failure to "mention that the plaintiffs carried this burden." Maj. op. at 734. Along this same vein, the majority

opinion mistakenly cites *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293–94, 60 L.Ed.2d 870 (1979) (*Feeney* ), to support its holding.

Equal protection clause analysis distinguishes between facial classifications and non-facial classifications. Non-facial classifications, such as the veteran-preference policy at issue in *Feeney,* are subject to heightened scrutiny *only* upon proof that they have a disparate impact on a protected group *and* are motivated by a discriminatory intent. *Id.* at 272–74, 99 S.Ct. at 2292–94. By contrast, overt gender classifications of similarly situated people, such as the gender-based prison policy in the present case, are subjected to the heightened scrutiny set forth in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), under which the government bears the burden of establishing that the gender classification has an important purpose and that the relationship between purpose and classification is substantial. Intentional discrimination can be presumed where the government fails to meet this burden. In *Feeney,* the Supreme Court opined that purposeful discrimination is " 'the condition that offends the Constitution,' " 442 U.S. at 274, 99 S.Ct. at 2293 (citations omitted), at least where a covert or overt gender-based classification is *not* in issue. In other words, "purposeful discrimination is the subject of the inquiry *absent* a discernible, non-neutral legislative or administrative classification subject to the important governmental interest/substantial relation test." *Marshall v. Kirkland,* 602 F.2d 1282, 1299 (8th Cir.1979) (emphasis added). Cases involving an overt or covert gender-based prison policy do not require explicit findings of intentional or purposeful discrimination, but rather are correctly analyzed by employing the important governmental interest/substantial relation test to implicitly establish discriminatory intent. *See, e.g., West,* 847 F.Supp. at 405–07; *McCoy v. Nevada Dep't of Prisons,* 776 F.Supp. 521, 523 (D.Nev.1991); *Dawson v. Kendrick,* 527 F.Supp. 1252, 1372 (S.D.W.Va. 1981); *Bukhari,* 487 F.Supp. at 1171.[2] The

---

**2.** Eighth Circuit analysis is in accord. *See, e.g., Navedo v. Preisser,* 630 F.2d 636, 641 (8th Cir. 1980) (state statute which prohibited males over

twenty-five years old from engaging in sexual intercourse with females sixteen years old, without punishing female over twenty-five years of

existence of intentional discrimination is intertwined with the heightened scrutiny framework. "[E]vidence that invidious discrimination—the ultimate object of heightened scrutiny—produced or underlies the classification at hand would doom the [contested] prisoner policy [by] *demonstrating its lack of direct and substantial relation to an important governmental interest.*" *Pitts v. Thornburgh,* 866 F.2d 1450, 1459 (D.C.Cir. 1989) (emphasis added).

The majority opinion correctly notes that the female inmates of NCW do not challenge the classification by "Nebraska prisons in that male and female inmates are segregated by institution." Maj. op. at 734. However, the majority opinion then erroneously concludes that, because the gender-based segregation of inmates is not directly challenged, a facially neutral policy is at issue, and *Feeney* and its requirement of express findings of discriminatory intent must control.

Plaintiffs, as noted above, do not challenge the policy of incarcerating men and women in separate institutions. They do assert, however, "that the policy of housing men and women in separate institutions has been applied in such a manner as to relegate women to an inferior opportunity to take advantage of academic, vocational, and training opportunities." *Canterino v. Wilson,* 546 F.Supp. 174, 211 (W.D.Ky.1982), *as amended,* 562 F.Supp. 106, (1983) *aff'd,* 875 F.2d 862 (6th Cir.), *cert. denied,* 493 U.S. 991, 110 S.Ct. 539, 107 L.Ed.2d 536 (1989). To state otherwise, the *consequence* of the gender-based prison segregation system in Nebraska is a gross inferiority in a host of opportunities for female inmates at NCW as compared to males at NSP. As such, Nebraska must show that the *disparate treatment* of female inmates is substantially related to an important governmental interest. "Where the actual consequence of a seemingly harmless classification reveals disparate treatment, there is ample justification to treat the classification and its consequence together in order to determine the 'fit' between this end result and the [governmental interest]." *Id.*

546 F.Supp. at 211 (quoting *Glover v. Johnson,* 478 F.Supp. 1075, 1080 (E.D.Mich.1979) (*Glover* )).

In the present case, the district court astutely concluded that a facially gender-based policy existed:

> [T]here is no doubt that women are incarcerated at NCW because of their gender and not for some other reason. There is only one prison for women in the State of Nebraska. Whether a woman is convicted of writing bad checks or of murder, she will find herself at NCW when sentenced to prison. Men, on the other hand, could be sent to a variety of institutions depending upon a variety of penological goals—from security to programming. As a consequence, despite the fact that nongender-related reasons may exist to justify treating female prisoners differently from male prisoners, *the fact remains that female prisoners, as a result of their gender alone, can receive only the programs available at NCW. Therefore, if the programming at NCW is comparatively inferior to programs at NSP, the female recipients may receive poor programming because of their gender and not for some nongender-related reason.*

*Klinger,* 824 F.Supp. at 1388 (emphasis added); *accord Bukhari,* 487 F.Supp. at 1171 (sex-based, disparate treatment analysis applied to plaintiff's claim, *inter alia,* that the limited opportunity for education for female maximum security prisoners at all-female prison compared to those opportunities for male maximum security prisoners at major male prisons violated equal protection clause); *Batton v. North Carolina,* 501 F.Supp. 1173, 1176 (E.D.N.C.1980) (where female inmates were incarcerated at all-female institution, rather than any other prison operated by the Department, solely because of their gender, court applied facial-classification analysis to female inmates' equal protection claim that they allegedly received vocational training opportunities only in low-paying, traditionally female jobs while male in-

age for engaging in sexual intercourse with males sixteen years old violated equal protection clause "[b]ecause the state has failed to show that its gender-based classification substantially

furthers the [governmental objectives of] prevention of physical injury, emotional trauma, or pregnancy caused by sexual intercourse with an older person").

mates were afforded training in a wide variety of occupations); *Glover,* 478 F.Supp. at 1080 (given the inferior programs offered at female prison, the practical effect of housing women separately is to deny them access to the range and quality of programs offered male inmates based solely on their gender).[3]

In the present case, the district court correctly reasoned that the offering of educational, vocational, and recreational programs only in the men's prison, without offering equivalent programs in the women's prison, constituted a denial of benefits of a program *because of sex.* In a voluminous and comprehensive opinion, the district court weighed and analyzed in great detail the abundance of evidence which showed that the gender-based allocation of programs and services sprang from indifference, bias, and stereotypical notions of women's role in society. Contrary to the majority opinion's assertion, the district court did not assume any inferior program or service at NCW was the product of intentional discrimination. Rather, the framework employed for determining whether an Equal Protection Clause violation existed was to determine

> whether there are programs (means) afforded (in quantity or quality) to male inmates at NSP but not female inmates at NCW which place a "substantial burden" on female inmates (disparity); if so, ascertain whether there is an important governmental objective (objective) which underlies the "means"; if so, finally decide whether the "means" chosen to further the governmental "objective" are directly and substantially related to the "objective" (relationship of means to objective) such that the "disparity" may be overlooked.

*Klinger,* 824 F.Supp. at 1391.

In short, the district court correctly considered whether or not the facially gender-based allocation of programs and services constituted unconstitutional discrimination as defined by such leading cases as *Craig v. Boren* and *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1981) (*Hogan* ). By analyzing whether or not the Department of Corrections' unequal allocation of programs and services responded substantially to an important governmental interest, the district court completed its task of determining whether or not invidious discrimination existed. The district court did not impermissibly shift "the burden to the defendants to justify differences in prison programming on sex-neutral grounds and thus *disprove* discriminatory purpose," as argued by the majority opinion, Maj. op. at 734, but rather, the district court correctly required the defendants to "carry the burden of showing an 'exceedingly persuasive justification' for the classification." *Hogan,* 458 U.S. at 724, 102 S.Ct. at 3336 (citing *Kirchberg v. Feenstra,* 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981); *Feeney,* 442 U.S. at 273, 99 S.Ct. at 2293). As noted above, the district court carefully reviewed the defendants' evidence and found that the defendants failed to show any exceedingly persuasive justification for the sex-based difference in treatment.

I also agree with the district court's well-reasoned analysis regarding the remaining issues presented on appeal, and, accordingly, I would affirm the judgment of the district court in all respects.

---

3. As observed by the court in *Glover:*
 [A] female in the State of Michigan will be sent to Huron Valley by reason of her gender alone, and will necessarily have access only to these programs currently available at that location. A male prisoner, on the other hand, can be classified or later transferred to a wide variety of prison facilities in the State and will have access to more program opportunities than his female counterpart. I conclude, therefore, that because of these limitations women as a group are treated differently than men as a group, and that these differences in treatment are directly related to gender.
 *Glover,* 478 F.Supp. at 1078.