BOWMAN, Circuit Judge.
Appellants, a certified class of female inmates who are now or who may be in the future confined in Missouri penal institutions, appeal a portion of the judgment of the District Court,[1] in favor of Missouri Department of Corrections and Human Resources (Department) officials. The women inmates originally brought this 42 U.S.C. § 1983 action against Department officials alleging discriminatory treatment and seeking injunctive relief. Only two issues have been raised in this appeal. The female prisoners contend that the District Court erred in rejecting their claims that prison officials discriminated against them on the basis of gender in violation of the Equal Protection Clause by failing to provide them with equal access (1) to post-secondary educational programs and (2)'to prison industry employment. The District Court held that the availability of post-secondary educational courses hinged on fiscal decisions made by the academic providers and on a lack of demand by female inmates rather than on any discriminatory action tak *646 en by the Department. The Department has since filed a motion to dismiss as moot the female inmates’ appeal regarding post-secondary educational opportunities. We agreed to take this motion into consideration with the merits of the case and hereby grant the Department’s motion to dismiss this portion of the ease as moot. To that extent, the order of the District Court is vacated. As to the prison industries claim, the District Court found insufficient evidence of discriminatory intent on the part of Department officials to support an equal protection challenge. Concluding that the District Court’s finding of no discriminatory intent is not clearly erroneous, and further concluding that the female inmates are not similarly situated to male inmates for purposes of equal protection analysis, wé affirm the District Court’s order dismissing this claim.
I.
The facts of the case are not in dispute. Male and female inmates incarcerated within Missouri Department of Corrections prisons are segregated into particular facilities by gender.[2] The Department operates fifteen penal .institutions, two of which, the Renz Correctional Center[3] (Renz) and the Chilli-cothe , Correctional Center (Chillicothe), house solely adult female inmates. Corrected Joint Stipulations, Appellant’s App. at 27. The vast majority of the total inmate population in adult institutions in Missouri, approximately ninety-five percent, is male. Id. at 28. Both male and female inmates are assigned custody level classifications ranging from minimum security, Cl, to maximum security, C5, and these designations affect inmate housing assignments within the gender-segregated facilities. Generally, the higher custody classifications, C4 and C5, are assigned to male and female inmates with longer sentences to serve and to shorter-term inmates of both genders who represent an increased security risk. Female inmate custody levels range from Cl through C3 at Chillicothe and from C3 through C5 at Renz.
Approximately 725 female inmates are incarcerated in the Department’s female-only prisons, some 420 at Chillicothe and some 305 at Renz.[4] Approximately 13,000 male inmates are incarcerated in the Department’s male-only prisons, some' 1200 at Algoa Correctional Center; 900 at Booneville; 1200 at Central Missouri Correctional Center; 1800 at Farmington Correctional Center; 2000 at Jefferson City Correctional Center; 1265 at Moberly Correctional Center; 1100 at Missouri Eastern Correctional Center; 500 at Potosí Correctional Center; 2000 at Western Missouri Correctional Center; and 600 at Ozark Correctional Center.
Female inmates incarcerated at the Renz and Chillicothe facilities have access to the same adult basic education and G.E.D. programs as male inmates. Both male and female prisoners can take advantage of college-levél correspondence courses at their own expense. Post-secondary courses conducted within the confines of the prison facilities are offered by community colleges, state universities, and private colleges, and not by the Department itself. Educational institutions enter into agreements with the Department for access to physical space within both male and female prisons and for administrative support, such as security and assistance in enrolling the inmates. Decisions regarding the number and variety of post-secondary programs offered at a particular prison facility are made by the educational institutions *647 involved and not by the Department. The Department requires that any courses that the schools choose to offer be of the same quality as those the schools offer to their on-campus students.
Prison enterprises are operated by Missouri Correctional Enterprises (MCE), a private, self-supporting, profit-making enterprise that does not receive funding from the Missouri General Assembly. Twenty-one such enterprises are located at male institutions and three at female institutions. Report and Recommendation at 10. Male inmates have a broader range of industry job opportunities, but industries are located at both women’s facilities and only at some of the male facilities. Id. For fiscal year 1991, approximately thirteen percent of the total female initiate population was employed in prison industry programs. Corrected Joint Stipulations, Appellant’s App. at 28, 36. During the same time period, only eight percent of the total male inmate population was so employed. Id.
II.
We first consider the Department’s motion to dismiss as moot the women prisoners’ claim that Department officials purposely discriminated against them on the basis of gender in the management of post-secondary educational opportunities. During the pen-dency of this appeal, Department officials terminated their former practice of allowing outside educators access to male and female prison facilities for the purposes of providing college-level courses to inmates. Affidavit of John J. Bell in support of Appellee’s Motion to Dismiss Point I of Appellants’ Appeal as Moot. Neither male nor female prisoners are currently provided this opportunity, a fact appellants do not contest.'
A claim is properly dismissed as moot if it “has lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law.” Princeton Univ. v. Schmid, 455 U.S. 100, 103, 102 S.Ct. 867, 869, 70 L.Ed.2d 855 (1982) (per curiam) (quotations and citations omitted) (holding that university’s amendment of regulation made moot a challenge to regulations). Where, as here,
(1) it can be said with assurance that there is no reasonable expectation ... that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation !.. it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law.
County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quotations and citations omitted). Here, prison officials have abandoned the post-secondary educational programs about which the women prisoners complained.[5] There is no indication that Department officials will reinstate these educational programs. In these circumstances, the requested relief — equal access to such programs by both male and female inmates — has become an abstraction, and this aspect of the case has “lost its character as a present, live controversy.” Schmid, 455 U.S. at 103, 102 S.Ct. at 869 (quotation omitted). As a result, we conclude that the women prisoners’ equal protection claim concerning post-secondary educational programs is moot and we grant the Department’s motion to dismiss this claim. Those portions of the District Court’s order dealing with this claim are vacated. United States v. Munsingwear, Inc., 340 U.S. 36, 39, 71 S.Ct. 104, 106-07, 95 L.Ed. 36 (1950); Cranford v. Nix, 43 F.3d 1210, 1211 (8th Cir.1995).
III.
We turn now to the women’s contention that Department officials’ policy for determining the placement of prison industries is exercised in a manner that violates the Equal Protection Clause. To establish a gender-based claim under the Equal Protee *648 tion Clause, the appellants must, as a threshold matter, demonstrate that they have been treated differently by a state actor than others who are similarly situated simply because appellants belong to a particular protected class. See, e.g., Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir.1994), cert. denied, — U.S. -, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995). In general, the Equal Protection Clause requires that the government treat such similarly situated persons alike. See, e.g., City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); Klinger, 31 F.3d at 731; Moreland v. United States, 968 F.2d 655, 660 (8th Cir.) (en banc), cert. denied, 506 U.S. 1028, 113 S.Ct. 675, 121 L.Ed.2d 598 (1992). Treatment of dissimilarly situated persons in a dissimilar manner by the government does not violate the Equal Protection Clause. Klinger, 31 F.3d at 731; see Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp., 21 F.3d 237, 242 (8th Cir.1994); Women Prisoners of the Dist. of Columbia Dep’t. of Corrections v. District of Columbia, 93 F.3d 910, 924 (D.C.Cir.1996). Therefore, the initial inquiry in any equal protection claim is whether the plaintiff has established that she was treated differently than others who are similarly situated to her. Klinger, 31 F.3d at 731; United States v. Whiton, 48 F.3d 356, 358 (8th Cir.), cert. denied, — U.S. -, 116 S.Ct. 227, 133 L.Ed.2d 156 (1995). As we observed in Klinger, “Absent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim.” 31 F.3d at 731.
Thus, before we may entertain the merits of the female inmates’ equal protection claim, we must first determine whether women incarcerated by the Missouri Department of Corrections are similarly situated, for purposes of the program in issue, to men likewise incarcerated. Whether the female inmates are similarly situated to male inmates requires an inquiry focusing on the purposes of the challenged government action, namely, the assignment of prison industry programs among the various institutions controlled by the Department. See More v. Farrier, 984 F.2d 269, 271 (8th Cir.), cert. denied, 510 U.S. 819, 114 S.Ct. 74, 126 L.Ed.2d 43 (1993).
In Klinger, this Court was asked to determine whether female prisoners, all of whom were incarcerated at the Nebraska Center for Women (NCW), were subjected to gender discrimination by the Department of Correctional Services in violation of the Equal Protection Clause due to the alleged inferiority of the vocational, educational, and employment opportunities and programs offered to women in comparison to those offered to male prisoners incarcerated at Nebraska State Penitentiary (NSP), one of a number of male-only prisons. 31 F.3d at 729. This Court held, as a matter of law, that female inmates at NCW and male inmates át NSP were not similarly situated for purposes of prison programs and services and, therefore, that the plaintiffs failed'to establish a violation of the Equal Protection Clause. Id. at 731.
In arriving at our conclusion that the male and female inmates in Klinger were dissimi-larly situated, we considered a number of factors including prison population size, average length of sentence, security classification, types of crimes, and other special characteristics. Id. at 731-32; see also Pargo v. Elliott, 894 F.Supp. 1243, 1259 (S.D.Iowa 1995), aff'd, 69 F.3d 280 (8th Cir.), cert. denied, — U.S. -, 117 S.Ct. 98, 136 L.Ed.2d 53 (1996). Because a comparison of these factors between the male inmates at NSP and the female inmates at NCW revealed a wide disparity in each category, this Court concluded that “the programs at NSP and NCW reflect separate sets of decisions based on entirely different circumstances.” Klinger, 31 F.3d at 732. Programming decisions regarding industry and education differed from prison to prison, “depending on innumerable variables that officials must take into account” and not on illegitimate, discriminatory factors. Id. Analysis of the sort that we employed in Klinger leads us to the same result in the present case.
Initially, the irrefutable differences between the female-only facilities, Renz and Chillicothe, and the various institutions housing male inmates in Missouri must be ac *649 knowledged. Most notably, because women account for such a small proportion of the total prison population, their facilities are necessarily smaller in size than any of the male-only prisons.
Taking into account security classification levels in addition to population size further illustrates that female inmates are dissimilarly situated from male inmates. For example, Chillieothe has a population of 430 female inmates assigned the lowest classification levels ranging from Cl through C3. Corrected Joint Stipulations, Appellant’s App. at 27, 28. The most comparable male institution with respect to population size, Potosí Correctional Center with 500 inmates, bears no resemblance to Chillieothe with respect to security levels, as it houses only male prisoners assigned the highest security classification, C5. Id. at 27. The male institutions most comparable to Chillieothe with respect to security classification, Central Missouri Correctional Center and Western Missouri Correctional Center, which both confine inmates classified at levels C2 and C3, house considerably larger inmate populations, namely, 1000 men at Central Missouri and 1975 men at Western Missouri. Id.
The average sentence length for female inmates as compared to male inmates confirms that these two diverse groups are not similarly situated. Significantly fewer female inmates will be serving lengthy prison sentences in comparison to male inmates. This observation is evidenced by the vast-disparity in the number of female inmates classified as medium or maximum security risks as compared to the number of male inmates likewise classified. See' Corrected Joint Stipulations, Appellant’s App. at 27-28. A small number of women prisoners, approximately 305, are assigned the highest security classifications, thereby indicating that they will be incarcerated for extended periods of time. In contrast, roughly 6700 male inmates have been assigned the highest security classifications and will, therefore, likely be serving lengthy prison sentences. This distinction also tends to establish that male inmates have been convicted of more serious crimes, thus justifying the higher security classifications associated with lengthier prison sentences.
As is apparent from the above observations, male and female inmates incarcerated in Department prisons are far from similarly situated for purposes of equal protection analysis. In determining the availability and location of prison programs and services, officials “must balance many considerations, ranging from the characteristics of the inmates at that prison to the size of the institution, to determine the optimal mix of programs and services.” Klinger, 31 F.3d at 732; see Turner v. Safley, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259-60, 96 L.Ed.2d 64 (1987). Because these considerations are diverse and the circumstances of each prison are different, female inmates as a group and male inmates as a group simply cannot be considered similarly situated for purposes of comparing the availability and variety of prison programming. The size of the institution, its location, and the types of inmates housed there necessarily will affeet the number, type, and length of programs offered.
The women prisoners urge this Court'to conduct a program-by-program comparison between Department prisons housing solely female inmates and those housing only male inmates to confirm the existence of gender discrimination. We reject that approach to equal protection analysis of the Department’s placement of prison industries. There can be no such meaningful comparison for equal protection purposes between two sets of inmates who are not similarly situated. See, e.g., Association of Residential Resources v. Gomez, 51 F.3d 137, 140-41 (8th Cir.1995); Klinger, 31 F.3d at 733; Women Prisoners of the District of Columbia, 93 F.3d at 927. The substantial differences. discussed above between male and female prisoners demonstrate the dissimilarity of the two distinct groups and the irrelevance of any attempt to compare the number or type of programs offered. Furthermore, this Court concluded in Klinger that “using an intér-prison program comparison to analyze equal protection claims improperly assumes that the Constitution requires all prisons to have similar program priorities and to allocate resources similarly.” 31 F.3d at 732. We álso noted that *650 inter-prison program comparison “results in precisely the type of federal court interference with and ‘micro-management’ of prisons that Turner condemned.” Klinger, 31 F.3d at 733 (following Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).
For the foregoing reasons, we hold that male and female prisoners are not similarly situated for purposes of an equal protection comparison of prison industry programs.
IV.
Even assuming, for the sake of argument, that male and female inmates were similarly situated for purposes of the Department’s placement of prison industries, an equal protection review of Department decisions requires further analysis. It must be determined whether the unequal treatment in accessibility to prison industry employment allegedly resulting from gender discrimination stems from a Department policy that is facially neutral or from a policy that, on its face, classifies by gender. A facially gender-based classification is subject to heightened, scrutiny and violates the Equal Protection Clause if the classification is not substantially related to the achievement of important governmental objectives. United States v. Virginia, — U.S. -, -, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996); Personnel Adm’r v. Feeney, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979); Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982).
A facially neutral policy, on the other hand, is not subject to the same exacting standard as it does not categorize on the basis of a quasi-suspect class. If, however, a neutral policy employed by the Department has a disproportionately adverse effect upon women, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose. Feeney, 442 U.S. at 272, 99 S.Ct. at 2292-93.
When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionately adverse, a twofold inquiry is ... appropriate. The first question is whether the statutory classification is indeed neutral in the sense that it is not. gender based. If the classification itself, covert or overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination.
Id. at 274, 99 S.Ct. at 2293; see Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 264-66, 97 S.Ct. 555, 562-64, 50 L.Ed.2d 450 (1977); Marshall v. Kirkland, 602 F.2d 1282, 1299 (8th Cir.1979). If the adverse impact of a facially neutral policy cannot be plausibly explained on a neutral ground, the impact itself would signal that the real classification made by the policy was in fact not neutral.[6] Feeney, 442 U.S. at 275, 99 S.Ct. at 2294.
Here, the women prisoners do not challenge the Department policy of segregating male and female prisoners by gender. Rather they challenge the Department policy which determines the placement of a particular prison industry at a specific penal facility. It is this policy that the appellants contend results in a disparate impact on female prisoners and constitutes a violation of the Equal Protection Clause. The disparate impact, according to the female inmates, is evidenced through the placement of stereotypieally female jobs at the Renz and Chillicothe facilities and the exclusion of female inmates from the more skilled and industrial jobs located at male prisons.
Initially, we note that the statutory provisions granting the Department authority to establish and monitor prison industries are gender-neutral on their face. See, e.g., Mo. Rev.Stat. § 217.550 (1994). Likewise, a review of Department officials’ testimony indicates that Department policy for the placement of prison industries is based on factors such as population size, availability of a steady work force, and location of the prison *651 in relation to potential purchasers of industry products, not on the basis of gender considerations. Department officials have countered the appellants’ allegations of gender-motivated discrimination with a plausible explanation for the alleged disparate impact. As such, it is appellants’ burden to establish that the adverse effect this Department policy has on women inmates is the result of a discriminatory purpose.
The District Court found that the scope of prison enterprise opportunities provided to male and female inmates “appears directly related to the size and location of the prisons and a recognition that more male inmates are available for long-term manufacturing jobs than women inmates.” [7] Report and Recommendation at 10.
Because the policy challenged by the appellants is neutral on its face, the female prisoners must establish that the alleged disparate impact is the result of discriminatory purpose. We agree with the District Court that appellants have failed to prove the requisite discriminatory intent on the part of Department officials. Assuming as a threshold matter that the women prisoners have demonstrated disparate impact, their equal protection claim will fail nonetheless without' a showing of discriminatory intent. See Feeney, 442 U.S. at 274, 99 S.Ct. at 2293-94; Arlington Heights, 429 U.S. at 265, 97 S.Ct. at 563. “ ‘Discriminatory purpose’ ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part ‘because of,’ not merely ‘in spite of,’ its adverse effects upon an identifiable group.”, Feeney, 442 U.S. at 279, 99 S.Ct. at 2296 (citation and footnote omitted).
The District Court’s findings show that prison industry jobs are located at both women’s facilities and only at certain male facilities. Report and Recommendation at 10. A proportionately larger number of female inmates have prison industry jobs than do male inmates, and the data-entry industry located at the Renz facility, criticized by plaintiffs as a stereotypically female occupation, formerly employed male inmates when the institution housed males. Department officials testified that the location of prison industries was motivated not by stereotypes but by legitimate concerns such as work force stability and proximity to clientele. Thus, as the District Court found, the evidence does not support a claim that the Department’s placement of prison industry jobs was intentionally discriminatory or gender-motivated. See also Klinger, 31 F.3d at 733-34; Pargo, 894 F.Supp. at 1280; Women Prisoners of the Dist. of Columbia, 93 F.3d at 925.
Because no two prisons are the same, it is a virtual certainty that inmates in one prison will have certain amenities not available to inmates in another. “Thus, female inmates can always point out certain ways in which male prisons are ‘better’ than theirs, just as male inmates can always point out other ways in which female prisons are ‘better’ than theirs.” Klinger, 31 F.3d at 732; see also Women Prisoners of the Dist. of Columbia, 93 F.3d at 926-27. “Differences between challenged programs at ... prisons are virtually irrelevant because so many variables affect the mix of programming that an institution has_ In short, comparing programs ... is like the proverbial comparison of apples to oranges.” Klinger, 31 F.3d at 733. When attempts are made to compare programs offered at facilities housing inmates who are not similarly situated, “it is hardly surprising, let alone evidence of discrimination, that the smaller correctional facility offered fewer programs than the larger one.” Women Prisoners of the Dist. of Columbia, 93 F.3d at 925.
V.
For the reasons stated, we affirm the District Court’s order dismissing the appellants’ *652 equal protection claim with respect to prison industry programs and grant the Department’s motion to dismiss as moot appellants’ equal protection - claim regarding post-secondary educational opportunities. The order of the District Court is vacated insofar as it deals with the latter claim.

. The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri, adopting the Report and Recommendation of The Honorable William A. Knox, United States Magistrate Judge for the Western District of Missouri.

. Appellants do not challenge the constitutionality of this gender-based classification. See Women Prisoners of the Dist. of Columbia Dep't of Corrections v. District of Columbia, 93 F.3d 910, 926 (D.C.Cir.1996); Pitts v. Thornburgh, 866 F.2d 1450, 1458-59 (D.C.Cir.1989).

. The Magistrate Judge observed that, due to extensive flooding which occurred in July and August, 1993, Renz was evacuated and the female inmates at the facility were moved to facilities that normally house only male inmates, including Central Missouri Correctional Center (CMCC) and Fulton Reception and Diagnostic Center (FRDC). The majority of the females from Renz were moved to CMCC and will remain at that institution during the emergency conditions created by flood waters. Renz will not be reopened in the immediate future, if at all, due to considerable damage to the facility. Interim arrangements for educational classes and prison industries have been implemented.

.Renz was originally a male institution, then housed both women and men, and finally became a women's prison in December 1989.

. At oral argument, counsel advised the Court that inmates no longer are able to secure federal financial assistance for enrolling in these educational programs. Colleges and universities that offered these programs at Department prisons have elected to discontinue the practice for economic reasons.

. As we noted in Ricketts v. City of Columbia, 36 F.3d 775, 781 (8th Cir.1994), "in only a few cases, where a facially neutral policy impacted exclusively against one suspect class and that impact was unexplainable on neutral grounds, has the impact alone signalled a discriminatory purpose. See Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).”

. The statutory mandate bestowing on the Department the power to establish prison industries instructs that the director shall take into account: "offender custody levels, the number of offenders in each correctional center so the best service or distribution of labor may be secured, location and convenience of the correctional centers in relation to the other con-ectional centers to be supplied or served and the machinery presently contained in each correctional center.” Mo.Rev. Stat. § 217,550(1) (1994).