Richard L. WALKER, et al., Plaintiffs,

v.

Governor Ben NELSON, et al., Defendants.

No. 4:CV92–3104.

United States District Court, D. Nebraska.

Sept. 19, 1994.

David H. Fisher, Dunmire, Fisher Law Firm, Hastings, NE, for plaintiffs.

Alfonza Whitaker, Asst. Atty. Gen., Lincoln, NE, for defendants.

## MEMORANDUM OF DECISION

URBOM, Senior District Judge.

The plaintiffs, John K. Hake, Richard T. Walker and Joseph M. Salazar, are prisoners under the jurisdiction of the Nebraska Department of Corrections. They have filed this civil rights action against Ben Nelson, Governor of the State of Nebraska and Chairman of the Nebraska Board of Pardons; Donald Stenberg, Attorney General of the State of Nebraska and member of the Nebraska Board of Pardons; Harold Clarke, Director of the Nebraska Department of Corrections; and Gary Grammer, former Superintendent of the Hastings Corrections Center, where plaintiffs were previously confined.

The plaintiffs allege that Governor Nelson and Attorney General Stenberg have violated their Fourteenth Amendment rights to due process and equal protection by adopting a policy or procedure which systematically denies commutation of second-degree murder sentences because of parole eligibility. As a result of this policy, plaintiffs claim that they are denied (1) a mandatory discharge date, (2) a tentative release date, (3) accumulated good time, and (4) participation in community based programs. Plaintiffs further contend that defendants Clarke and Grammer have violated their constitutional right by directing the implementation of these policies.

On May 9, 1994, a bench trial was held. John Hake testified for the plaintiffs. Ron Riethmuller, a records administrator, and Dennis Bakewell, an adult parole administrator, testified for the defendants. Riethmuller and Bakewell are employed by the Nebraska Department of Correctional Services ("DCS"). The plaintiffs submitted documentary evidence and both sides submitted post-trial briefs. Based on the testimony, evidence and arguments, the following represents my findings of fact[1] and conclusions of law.

## I. FINDINGS OF FACT

1. The Nebraska Constitution provides:

The Governor, Attorney General and Secretary of State, sitting as a board, shall have power to remit fines and forfeitures and to grant respites, reprieves, pardons, or commutations in all cases of conviction for offenses against the laws of the state, except treason and cases of impeachment.

Neb. Const. Article IV, § 13.

2. Under the Nebraska statutes "pardon authority" is defined as the authority to remit fines and forfeitures and to grant respites, reprieves, pardons, or commutations. *Neb.Rev.Stat.* § 83–170 (Reissue 1987).

3. The state statute delineating the pardon authority, applications for pardons, and consideration of those applications states:

(1) Any person desiring the Board of Pardons to exercise its pardon authority shall file a written application with its secretary. The application shall state the specific relief requested and such other information as is prescribed by the board.

(2) The application shall be considered with or without a hearing by the board at its next regular meeting or within thirty days, whichever is earlier. If a hearing is held, it shall be conducted in an informal manner, but a complete record of the proceedings shall be made and preserved.

*Neb.Rev.Stat.* § 83–1,129 (Reissue 1987).

4. The plaintiff Richard T. Walker was sentenced in 1966 to ten years to life in

---

1. On the day of trial, the parties filed a stipulation of facts with the Clerk of the District Court.

My findings of fact are based largely on the joint stipulation.

prison for second-degree murder and has served 28 years as of May 1994. Walker was paroled February 20, 1986, and violated parole on March 24, 1987. He was returned to custody as a parole violator on May 18, 1989. Walker was paroled a second time on December 18, 1989, violated parole, and was returned to custody as a parole violator on March 19, 1990. Walker is currently on work release at the Lincoln Community Corrections and was scheduled to have a final hearing for parole review on May 1, 1994.

5. The plaintiff Joseph Salazar was sentenced in 1966 to ten years to life in prison for second-degree murder and has served 28 years in prison. Salazar has been paroled on four occasions between January 1980 and September 1988 and has been returned to custody due to parole violations. He is currently assigned to medium security at the Nebraska State Penitentiary.

6. The plaintiff John Hake was sentenced in 1968 to ten years to life in prison for second-degree murder and has served 26 years in the Nebraska Department of Corrections. Hake was paroled on March 23, 1983. He violated parole and was returned to custody. Hake was paroled again on July 12, 1991, and violated parole on April 1, 1991. Hake is currently assigned to the Hastings Correctional Center at Minimum A custody.

7. The Pardons Board considered and denied Walker's two applications for commutation on June 27, 1979, and June 28, 1989. The Board considered and denied Hakes' six applications for commutation on June 14, 1983, March 11, 1986, June 23, 1987, December 2, 1987, March 10, 1988, and December 15, 1988.[2] Plt.Ex. 6–13.

8. Between January 1980 and March 1993, inmates sentenced to life in prison for first-degree murder have filed 113 applications for commutation. The Pardons Board

has granted 18 of the applications.[3] Plt.Ex. 14.

9. Between January 1980 and March 1993, inmates serving sentences from ten years to life imprisonment for second-degree murder have filed 49 applications for commutation. The Pardons Board has granted no application.[4] Plt.Ex. 15.

10. An inmate sentenced to ten years to life in prison does not need a commutation of his maximum life sentence to become eligible for parole. He receives a parole eligibility date upon commencement of his sentence. However, he earns no good time reductions, because he has no maximum term capable of being reduced.

11. An inmate sentenced to ten years to life in prison will remain incarcerated indefinitely if parole is not granted or is subsequently revoked. He can only receive a mandatory discharge from custody if the Pardons Board approves his application for commutation of his life sentence to a determinate number of years. Otherwise, he will only be discharged from custody if the Nebraska Board of Parole exercises its discretionary authority to discharge him from parole with the approval of the Pardons Board.

12. An inmate sentenced to life in prison for first-degree murder is not eligible for parole because the parole eligibility date is computed from the "bottom"/minimum term. Similarly, the inmate earns no good time reductions because he has no maximum sentence against which good time reductions can be applied. Because his incarceration is for life, the inmate has no tentative release date or mandatory discharge date.

13. Before an inmate sentenced to life imprisonment for first-degree murder can ever be eligible for parole consideration, he must first apply to the Pardons Board for commutation of his sentence, and the Par-

---

**2.** Plaintiffs' exhibit 15 reflects that Hake also applied for commutation on June 2, 1989.

**3.** Plaintiffs' Exhibit 14 reveals that the Board of Pardons has commuted 18 applicants from life to a term of years. One applicant's sentence was first commuted from death to life and then later commuted from life to a term of years. In all, 49 inmates applied for commutation; 18 inmates were successful.

**4.** According to Plaintiff's Exhibit 15, 17 second-degree murder inmates have applied to the Pardons Board for commutation of their life sentences. Between January 1980 and March 1993, the Pardons Board has denied a total of 39 applications filed by these 17 inmates, including six or seven applications from the plaintiff Hake and two applications from the plaintiff Walker.

dons Board must grant the commutation. When the Board commutes a life sentence to a determinate number of years, the inmate becomes eligible for parole considerations based upon the commuted minimum/maximum sentence. Following commutation, the inmate is entitled to good time reductions and receives a mandatory discharge-from-custody date. This mandatory discharge date is binding, regardless of whether parole is ever granted or revoked.

## II. CONCLUSIONS OF LAW

### 1. Procedural Due Process Claim

■ The plaintiffs allege that their rights to procedural due process have been violated by Governor Nelson's and Attorney General Don Stenberg's policy of denying commutation to inmates convicted of second-degree murder. The plaintiffs further allege that Harold Clarke and Gary Grammer violated the plaintiffs' due process rights by implementing and enforcing the policy. Because no evidence is before me that Joseph Salazar ever applied for commutation of his sentence, he is not a proper plaintiff, and I dismiss him.

■ A procedural due process claim requires a showing of: (1) a legal interest in life, liberty, or property that is protected by due process; and (2) a lack of procedures adequate to protect that interest. The initial inquiry in any due process claim is whether there has been a deprivation of a protected interest. A protected interest may arise from the United States Constitution itself or some independent source, such as a state law or regulation. *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). To create an interest arising from a state statute that is protected by due process the statute must speak in mandatory terms, such as "shall" or "must." *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 13, 99 S.Ct. 2100, 2106–07, 60 L.Ed.2d 668 (1979). Language which is merely suggestive or directory is not sufficient. *Id.*

■ To create a protected interest the statute must place substantive limitations on the discretion of state officials. *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981). "A state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right. Plainly, however, the underlying right must have come into existence before it can trigger due process protection." *Id.* at 463, 101 S.Ct. at 2464 (citations omitted).

■ The Nebraska Constitution empowers the Governor, Attorney General, and Secretary of State to grant commutations in all cases of conviction for offenses against the laws of the state, except cases of treason and impeachment. Neb. Const. Article IV, § 13. The statute defining pardon authority creates a right to apply for commutation. *See supra* Neb.Rev.Stat. § 83–1,129 (Reissue 1987). The statute mandates the Pardons Board to adhere to three requirements: (1) consider applications for commutation within a specific time period; (2) if a commutation hearing is held, make the hearing informal; and (3) make and preserve a complete record of the commutation proceedings. *Id.*

The plaintiffs do not challenge any acts by the Pardons Board concerning the submissions of their applications for commutation, the timeliness of the Pardon Board's decision, or the making and preservation of the record from the commutation hearing. Rather, the plaintiffs allege that the Pardons Board has adopted a policy in which the sentences of second-degree murderers serving ten years to life are not commuted because these inmates are eligible for eventual release through parole procedures. The plaintiffs contend that the Pardons Board's review of applications for commutation of second-degree murder sentences is a meaningless gesture, because the applications are not "considered" as mandated by section 83–1,129 of the Nebraska Revised Statutes.

I ordered the trial transcript and examined the testimony of witness Ron Riethmuller, the Records Administrator for the Nebraska Department of Correctional Services. The following testimony occurred on direct examination between state attorney Whitaker and witness Riethmuller:

Q. Mr. Riethmuller, are you aware of any second-degree murderers who have requested commutations and received them?

A. I'm not aware of that ... I know we have had several of them that asked. I'm not aware of any second-degree murderers that have received commutations.

Q. Do you have any idea why they haven't received commutations?

A. I've attended several Pardon Board hearings at the State Capitol building, and the reason that the Pardon Board has given that they do not commute second-degree murder sentences is that they don't feel it's necessary, that there's other provisions in the statutes that—that it isn't needed to be done.

Filing ___ at 3–4. Later on direct examination, Riethmuller stated, "[t]he reason the Pardon Board doesn't commute those [second-degree murder] sentences is because there is a—there is a provision in the Nebraska Statutes that grants the authority to the Board of Parole to discharge an inmate off of parole." *Id.* at 5.

■ I do not find that the practice described by Mr. Riethmuller amounts to a failure to "consider" the applications, including the plaintiffs'. It does confirm that in the hearings he has attended the Board has given a reason for not commuting second-degree murder sentences. Giving a reason, though not necessarily determinative, is indicative of "consideration" having been given. There is no evidence of a policy in the sense of an announced rule or practice that will govern future actions. Nebraska's statutes regarding parole board procedures give no substantive limitation on the Board's discretion. The Board must only "consider."

When the decision in this case turns, as it does, on what "consider"[5] means, I cannot overlook the fact that the parties have stipulated in their "Stipulation of Facts," filing 32, that the Pardons Board has "considered" the plaintiffs' applications. Each of paragraphs 6 through 13 recites that a plaintiff filed an application "which was considered and denied by the Nebraska Pardons Board...." I

cannot say that the Board or Nelson and Stenberg, as members of the Board, have not "considered" the plaintiffs' applications.

Nothing in the evidence ties the defendants Clarke or Grammer to any act claimed to be violative of the plaintiffs' rights.

**2. Equal Protection Claim**

■ The Equal Protection Clause of the United States Constitution requires government actors to treat similarly situated persons alike. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Recently, the Eighth Circuit Court of Appeals has ruled that "[d]issimilar treatment of dissimilarly situated people does not violate equal protection." *Klinger et al. v. Department of Corrections et al.,* 31 F.3d 727 (8th Cir.1994). Hence, the first step in analyzing an equal protection claim is to discern whether the plaintiff has demonstrated that he was treated differently from others who were similarly situated to him. *Id.* at 731. Without a threshold showing that he is similarly situated to those who allegedly receive special treatment, a plaintiff does not have a viable equal protection claim. *Id.*

■ The plaintiffs contend that second-degree murder inmates serving ten years to life sentences receive disparate treatment from that of first-degree murderers serving life terms because second-degree lifers are systemically denied commutation hearings and are therefore deprived of a mandatory discharge date, a tentative discharge date, a possibility to jam a sentence, and good time reductions.

I must first determine whether Nebraska inmates convicted of second-degree murder and sentenced to ten years to life are similarly situated to inmates convicted of first-degree murder and sentenced to life for purposes of the challenged government action. *More v. Farrier,* 984 F.2d 269, 271 (8th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 74, 126

---

**5.** Black's Dictionary defines the word **consider**: "To fix the mind on, with a review to careful examination, to examine; to inspect. To deliberate about and ponder over." Black's Law Dictionary 277 (5th ed. 1989).

L.Ed.2d 43 (1993). On direct examination state witness Riethmuller testified:

> Second-degree murder and first-degree murder cases are somewhat—are considerably different as far as parole eligibility goes. As Mr. Hake indicated earlier, a second-degree murder sentence, a ten years-to-life sentence, they are eligible for parole at a certain point at a ten-year minimum.
>
> A first-degree murderer must be commuted in order to become eligible for parole, because the bottom number is life. So we have a big difference. The second-degree murderers' life sentences are eligible for parole. First-degrees are not unless they are commuted.

Filing ___ at 4.

I agree with the state that a fundamental difference exists between second-degree and first-degree murderers serving life sentences in Nebraska. Inmates serving a life sentence for second-degree murder are immediately eligible for parole—and ultimately discharge—based on the ten-year bottom number.

Despite this difference, plaintiffs argue that under the parole system at DCS a first-degree murderer whose sentence is commuted may do less time than a second-degree murderer, because commutation provides a mandatory discharge date and the ability to jam the sentence. During the trial attorney Whitaker asked Dennis Bakewell, an adult parole administrator with DCS, about the perceived anomaly:

> Q. Now, Mr. Bakewell, there has been testimony regarding the first-degree murderers receiving commutations and being able to jam. Do the first-degree murderers who receive commutations end up serving less time than the second-degree murderers?
>
> A. In theory, they could serve less time in the institutions, but once both categories of individuals were on parole, the same discharge guidelines apply.
>
> . . . .
>
> Q. Are you aware of any commutations granted to the first-degree murderers in the last three years?

> A. There have been no commutations granted to first-degree murders [sic] since 1991 with the current Board of Pardons.

Filing ___ at 25–26.

 Even if the plaintiffs were similarly situated to first-degree murderers, an equal protection violation cannot be founded on theoretical possibilities. While Mr. Bakewell testified that he recalled five first-degree murderers being discharged from parole, no evidence is before me that these prior first-degree murder inmates served less actual prison time than the plaintiffs. Accordingly, I must deny the plaintiffs' equal protection claim against defendants Nelson, Stenberg, Clarke and Grammer.