```
                 _____

                 No. 94-3578
                 _____


Joseph Frank Hosna,                    *
                                       *
          Appellee,                    *
                                       *
     v.                                *
                                       *
Michael Groose; David Dormire;         *
Jon W. Kirk; Daniel Kempker;           *
Robert Acree,                          *
                                       *
          Appellants.                  *


                 _____                    Appeals from the United States
                                                District Court for the
                 No. 94-3579                     Western District of Missouri.
                 _____


Kelly Neal,                            *
                                       *
          Appellee,                    *
                                       *
     v.                                *
                                       *
Michael Groose; Gerald Bommell;        *
Jack Kirk, *
                                       *
          Appellants.                  *


                 _____

                 No. 94-3580
                 _____


Max D. Miller,                         *
                                       *
          Appellee,                    *
                                       *
     v.                                *
                                       *
Michael Groose; David Dormire;         *
Dick Moore; Steve Long; Gerald         *
Bommell; Jack Kirk,                    *
                                       *
          Appellants.                  *
```

_____

No. 94-3649
_____

Joseph Frank Hosna,                    *
                                       *
          Appellant,                   *
                                       *
     v.                                *
                                       *
Michael Groose; David Dormire;         *
Jon W. Kirk; Daniel Kempker;           *
Robert Acree,                          *
                                       *
          Appellees.                   *
                                       *
--------------------                   *
                                       *
Donald E. Miller,                      *
                                       *
          Appellant,                   *
                                       *
     v.                                *
                                       *
Michael Groose; Jon W. Kirk;           *
David Dormire; Gerald Bommell;         *
Daniel Kempker; Betty Jaeger;          *
John Doe; Robert Faith; James          *
Eberle,                                *
                                       *
          Appellees.                   *
                                       *
--------------------                   *
                                       *
Kelly Neal,                            *
                                       *
          Appellant,                   *
                                       *
     v.                                *
                                       *
Mike Groose; Gerald Bommell;           *
Jack Kirk, *
                                       *
          Appellees.                   *
                                       *
--------------------                   *
                                       *
Max D. Miller,                         *
                                       *
          Appellant,                   *

```
                                          *
          v.                              *
                                          *
Michael Groose; David Dormire;            *
Dick Moore; Steve Long; Gerald            *
Bommell; Jack Kirk,                       *
                                          *
          Appellees.                      *


          _____


          No. 94-3686
          _____


Donald E. Miller,                         *
                                          *
          Appellee,                       *
                                          *
          v.                              *
                                          *
Michael Groose; Jon W. Kirk;              *
David Dormire; Gerald Bommell;            *
Daniel Kempker; Betty Jaeger,             *
                                          *
          Appellants,                     *
                                          *
John Doe,                                 *
                                          *
Robert Faith,                             *
                                          *
          Appellant,                      *
                                          *
James Eberle,                             *
                                          *
          Defendant.                      *


          _____


          No. 95-1328
          _____


Robert Don Arnold,                        *
                                          *
          Appellee,                       *
                                          *
          v.                              *
                                          *
Dick Moore; Gail Hughes; Steve            *
Long; Michael Groose,                     *
                                          *
```

                    Appellants.              *

       _____

       No. 95-1329
       _____


Robert Don Arnold,                  *
                                    *
           Appellant,               *
                                    *
       v.                           *
                                    *
Dick Moore; Gail Hughes; Steve      *
Long; Michael Groose,               *
                                    *
           Appellees.               *

                         _____

               Submitted:  December 12, 1995

                 Filed:  April 4, 1996
                         _____

Before MAGILL, GOODWIN,* and MURPHY, Circuit Judges.

                    _____


MAGILL, Circuit Judge.

       Joseph Hosna, Donald Miller, Kelly Neal, Max D. Miller, and Robert
Arnold (the Inmates) are prisoners housed in Missouri's Jefferson City
Correctional Center's (JCCC) administrative segregation unit.[1]  They
brought separate 42 U.S.C. § 1983 actions

_____

        *THE HONORABLE ALFRED T. GOODWIN, United States Circuit
        Judge for the Ninth Circuit, sitting by designation.

        [1]Plaintiff James M. Boudreau has dismissed his cross-appeal,
and his case has been remanded to the district court for a hearing
on a motion to vacate.  In addition, plaintiff Richard Seefeldt
transferred to Pacific Correctional Center during the course of
litigation, and the district court dismissed his claims as moot;
plaintiff Michael Saunders' action was dismissed under Rule 41(a)
on December 17, 1993.

                            -4-

against JCCC officials, seeking damages and injunctive relief for alleged equal protection violations because they enjoyed fewer privileges than inmates housed in protective custody. The district court consolidated the cases and denied damages, but granted partial injunctive relief. JCCC officials appeal the district court's grant of partial injunctive relief, and the Inmates cross-appeal the denial of full injunctive relief. Because we hold that no equal protection violation occurred, we reverse the district court's grant of partial injunctive relief.

## I.

JCCC is a maximum security prison housing approximately 2000 of Missouri's most dangerous criminals. Prisoners are assigned to three housing categories: general population, protective custody, and administrative segregation. General population allows inmates the greatest number of privileges. Inmates in general population may have food, changes of clothing, televisions, and radios in their cells, and are allowed to attend group religious services, work, visit the law library, attend classes, eat in a cafeteria, have telephone access, have recreation with others, and go to the canteen frequently. Inmates in protective custody have much the same privileges as general population inmates, but for their safety live in a communal setting completely segregated from the general population inmates. Protective custody inmates have canteen privileges twice per week.

Administrative segregation is the most restrictive confinement setting. For their own and others' safety, inmates in administrative segregation are housed in individual cells and kept separate from all other inmates at all times. Administrative segregation inmates have very few privileges. To reduce the likelihood of weapons being created or hidden, the type and amount of personal property permitted to administrative segregation inmates is severely limited. To reduce the possibility of danger

by or to administrative segregation inmates, the inmates are allowed out of their cells only three hours per week for recreation. When out of their cells, inmates are handcuffed and escorted by guards. Inmates may not attend classes, religious services, or group recreational activities, they cannot work or visit the law library, they do not have telephone access for personal calls, their visitation privileges are more restrictive than that enjoyed by other inmates, and they have canteen privileges only twice per month.

Inmates are assigned to administrative segregation for a variety of reasons, including discipline, restraint of dangerous inmates and those prone to escape, medical quarantine, and additional security for inmates who would be unsafe in protective custody. The Inmates bringing this action are housed in administrative segregation by their own request, because they felt unsafe in both general population and protective custody.[2] They filed this lawsuit, arguing that they should be accorded the same privileges as inmates in protective custody, because they are in administrative segregation for their own safety rather than for

---

[2]In a joint stipulation, the parties agreed that

Inmates who have requested assignment to administrative segregation for protection at JCCC have done so because they have incurred gambling debts and either cannot or will not repay those debts, they have incurred debts for drugs, they have become the subject of homosexual advances or been assaulted, they have engaged in prostitution and gotten into trouble, they have been identified by other inmates as an alleged snitch, they have received threats from other inmates for various reasons including the nature of their crime or the victim of their crime, and they have had a falling out with their sexual partner.

Appellants' App. at 6.

disciplinary reasons.[3]  The Inmates sought a variety of injunctive relief, including that they be allowed to have a greater array and quantity of personal possessions in their cells.

The district court referred the case to a magistrate judge for an evidentiary hearing.  See 28 U.S.C. § 636(b)(1)(B).  Following the hearing, the magistrate judge determined that the JCCC officials had not violated the Inmates' right to equal protection, and recommended that all relief be denied.  Assuming that the Inmates held in administrative segregation for their own safety were similarly situated to inmates in protective custody, the magistrate judge concluded that the limitations placed on the Inmates in administrative segregation were rationally related to legitimate penological interests.  The magistrate judge found that

> there is a direct correlation between the amount of property possessed and danger.  Through testimony, the parties revealed that virtually any item possessed can be fashioned into a weapon.  Defendants showed ropes made out of paper bed sheets, handcuff keys made from plastic silverware, and "stickers" made from any type of metal or plastic, including disposable razors and food cans, and other instruments, used to stab and cut people.  Typewriters, television sets and radios have been disassembled and used as weapons and devices to jam door locks. Inmates have been able to manufacture brass knuckles and zip-guns.  Knives are made from razor blades and wood.  Cloth and paper bags of any kind can be used as "Cadillacs," a means to transport weapons or other items from one cell to another. With a little ingenuity, any item can be dangerous and threaten security.  Even if an inmate did not use the item of property to manufacture a weapon, another inmate could obtain the property from that inmate and manufacture a weapon to use against others.  Furthermore, the more property contained in a

---

[3]The Inmates essentially seek reinstatement of a fourth type of custody, previously available at JCCC, known as "no-contact, red-tag, protective custody."  This combined the enhanced security of administrative segregation with the greater privileges of protective confinement.  This fourth category was discontinued by the JCCC because it was impracticable, ineffective, and created additional risks to inmates.

cell, the more difficult it is to search for contraband which might be used as a weapon, key or device to jam a lock. The prison has a duty to protect not only the inmates, but also the guards. The more property that is allowed, the harder it is to provide security for everyone.

Report & Recommendation of Aug. 23, 1993, at 7.

The magistrate judge rejected the Inmates' contention that restrictions on their property were irrational because they were victims, rather than aggressors. The magistrate judge found that the Inmates "are all dangerous individuals who have been convicted of serious offenses involving violence." Id. at 8.[4] The magistrate judge also found that

Plaintiffs demonstrated they had been able to work within the system to obtain dangerous items such as shards of glass, soda and tuna cans, bug spray, caustic cleaning supplies, razor blades, marbles, a variety of metal objects and food stuffs.

Id. at 10.[5]

The magistrate judge concluded that "[i]f the court were to grant plaintiffs' request that they be allowed additional property,

---

[4]Inmate Arnold was convicted of first degree murder and escape from confinement. Inmate Donald Miller was convicted as a dangerous offender for forcible rape and first degree burglary. Inmate Neal was convicted for rape, kidnapping and sodomy. Inmate Hosna was convicted for forcible sodomy, forcible rape, armed criminal action, and kidnapping. Inmate Max Miller was convicted of first degree robbery and escape.

[5]Despite the Inmates' demonstrated capacity for violence and their continued threat to prison security, the limitations placed on the Inmates are not punitive in nature. As found by the magistrate judge, "[t]he harshness of the conditions in the no-contact administrative segregation status are not a result of defendants' desire to punish plaintiffs; rather, it is the unfortunate result of plaintiffs' need for protection." Report & Recommendation of Aug. 23, 1993, at 10.

it would merely increase the difficulty of providing security and would likely increase the number and severity of assaults which could be committed. Therefore, no violation of the equal protection clause has been shown." Id.

Upon de novo review of the magistrate judge's Report and Recommendation, the district court accepted the magistrate judge's findings of fact, and held that the defendants were not liable for money damages because they had not violated a well-established constitutional right. The district court rejected, however, the magistrate judge's conclusion of law that no equal protection violation had occurred due to the limitations on the Inmates' in-cell property privileges. The district court held that

> certain of the limitations imposed on the no-contact inmates are not justified by safety or security concerns or are an exaggerated response to such concerns. These no-contact protective custody inmates are not being punished; therefore, all reasonable efforts should be made to treat them on an equal basis with other protective custody inmates, if such efforts will not threaten the security or safety of the institution.

Order of Jan. 26, 1994, at 3-4. The district court remanded the case to the magistrate judge to determine appropriate injunctive relief.

After a second hearing, the magistrate judge recommended the grant of injunctive relief to meet some of the Inmates' requests. The magistrate judge first recommended that the frequency of the Inmates' access to the canteen be increased from once every two weeks to once every ten days. The magistrate judge also recommended that the Inmates be allowed to have the same quantity and type of food stuffs, stationary, and certain personal hygiene products as prisoners in protective custody. This included, for example, an increase in the number of Slim Jims from 0 to 6, bags of cookies from 1 to 5, fried pies from 1 to 6, and tubes of

toothpaste from 1 to 2.  See Report & Recommendation of June 24, 1994, at 7; Appellants' App. at 61-62, 67 (Attachment Charts A and F).

The magistrate judge also determined that much of the injunctive relief requested by the Inmates should be denied.  The Inmates conceded that there was no real discrepancy between the treatment afforded protective custody inmates and themselves with regard to meals, bedding, mail, hair care, laundry, and medical services.  The magistrate judge found that restrictions on the Inmates' visitation, religious services, telephone, recreation, showers, access to the law library, and possession of items other than food stuffs and underwear were rationally related to legitimate security concerns.[6]

Both parties filed objections to the magistrate judge's Report and Recommendation.  Upon de novo review, the district court adopted the magistrate judge's Report and Recommendation in full, and issued a permanent injunction against the JCCC officials.  The JCCC officials appeal the district court's grant of injunctive relief, while the Inmates appeal the district court's denial of full injunctive relief.  In addition, Inmate Arnold makes a pro se appeal of several issues.

**II.**

We review the district court's conclusions of law de novo, see More v. Farrier, 984 F.2d 269, 271 (8th Cir.), cert. denied, 114 S. Ct. 74 (1993), and its grant of injunctive relief for abuse of discretion; see F.T.C. v. Freeman Hosp., 69 F.3d 260, 267 (8th Cir.

_____

[6]The magistrate judge also found that the use of handcuffs while escorting the Inmates out of their cells was justified by security needs, and that requiring the Inmates to wear distinctive jump suits to identify them as administrative segregation inmates did not violate equal protection.

1995).  "Abuse of discretion occurs if the district court rests its conclusion on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions."  International Ass'n of Machinists & Aerospace Workers, Dist. Lodge 19 v. Soo Line R.R., 850 F.2d 368, 374 (8th Cir. 1988) (en banc), cert. denied, 489 U.S. 1010 (1989).

## III.

We begin our analysis by noting that it is not the role of federal courts to micro-manage state prisons.  See Klinger v. Department of Corrections, 31 F.3d 727, 733 (8th Cir. 1994), cert. denied, 115 S. Ct. 1177 (1995).  Instead, "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment. . . . Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life . . . ."  Sandin v. Conner, 115 S. Ct. 2293, 2299 (1995) (citations omitted).  In Procunier v. Martinez, 416 U.S. 396, 404-05 (1974), overruled in part, Thornburgh v. Abbott, 490 U.S. 401 (1989),[7] the Supreme Court explained the basis for this deference:

> Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration.  In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions.  More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention.  Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody.  The Herculean obstacles to effective

---

[7]In Thornburgh, the Supreme Court mandated greater deference by courts to prison administrators' decisions regarding prisoners' access to incoming correspondence than had been suggested by the Martinez decision.  See Thornburgh, 490 U.S. at 413-14.

-11-

discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

(notations omitted). See also Turner v. Safley, 482 U.S. 78, 84-85 (1987); Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 126 (1977).

Of course, "federal courts must take cognizance of the valid constitutional claims of prison inmates." Turner, 482 U.S. at 84. The Inmates bringing this action have a right to equal protection. See Lee v. Washington, 390 U.S. 333, 334 (1968) (per curiam). Where, as here, plaintiffs do not allege that they are members of a suspect class, we review their claims under a rational basis standard. See Moreland v. United States, 968 F.2d 655, 660 (8th Cir.) (en banc), cert. denied, 506 U.S. 1028 (1992). To prevail in their claims, the Inmates must prove that "(1) persons who are similarly situated are treated differently by the government, and (2) [that] the government [has failed] to provide a rational basis for the dissimilar treatment." Id. (citing Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439-41 (1985)).

We shall assume, without deciding, that the Inmates have met their burden of proving that they are similarly situated to inmates in protective custody. Cf. Divers v. Department of Corrections, 921 F.3d 191, 193 (8th Cir. 1990) (per curiam) (equal protection

claims of protective custody inmates were not frivolous).[8]  We therefore focus on the second step in the analysis, whether restrictions placed on the Inmates are "reasonably related to legitimate penological interests." Turner, 482 U.S. at 89.

The JCCC officials have attempted to prohibit administrative segregation inmates' access to objects which could be used to either create, conceal, or transport weapons or escape devices.  The JCCC officials' goal of maintaining security for inmates housed in administrative segregation and for JCCC staff is clearly a legitimate penological objective.  See Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").  Our inquiry in this case is therefore limited to whether the restrictions on the Inmates have a reasonable place in the assurance of security at the JCCC, see More, 984 F.2d at 269, and not whether defendants have shown a compelling reason for limiting the Inmates to a specific number of fried pies and Slim Jims.

---

[8]Because we conclude that the reasons given for dissimilar treatment of the Inmates and protective custody inmates are reasonably related to legitimate penological objectives, we need not reach the issue of whether they are, in fact, similarly situated.  We are, however, concerned that the district court presumed, because both the Inmates and protective custody inmates were in specialized confinement settings for their own protection, that they were necessarily similarly situated.  While the reasons that a prisoner is in a specific type of confinement may be relevant to an equal protection analysis, cf. Moreland, 968 F.2d at 661 (persons in same halfway house for different reasons not similarly situated), it is not determinative.  Rather, courts must focus "on whether the plaintiffs are similarly situated to another group for purposes of the challenged government action."  Klinger, 31 F.3d at 731; see also More, 984 F.2d at 271 (disabled inmates similarly situated to nondisabled inmates for certain purposes, but not for others).

Inmates who reside in administrative segregation have been generally identified as either being a particular danger to others, or being in particular danger from others. Because of this, the security needs of this unit are heightened, and every inmate must be construed as a potential threat to every other inmate. See Report & Recommendation of Aug. 23, 1993, at 8-9.[9] In addition, having variable rules for differing classes of inmates within administrative segregation could lead to confusion and dangerous errors by staff. Finally, allowing any inmate in administrative segregation to have possession of prohibited objects increases the likelihood that other, possibly more dangerous, inmates will acquire those items.

JCCC officials had previously extended additional privileges to inmates in the Inmates' circumstances, and concluded that "no-contact, red-tag, protective custody" was not a workable alternative at the JCCC. When creating policies "at an individual prison under the restrictions of a limited budget, prison officials must make hard choices. They must balance many considerations, ranging from the characteristics of the inmates at that prison to the size of the institution" to create an optimal set of privileges and restrictions. Klinger, 31 F.3d at 732. Second guessing state prison administrators' decisions inhibits their willingness to experiment and innovate, see id., and is not authorized by the Equal Protection Clause. See New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (per curiam) (Fourteenth Amendment does not authorize the judiciary to "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines").

---

[9]While it is true that the Inmates are in administrative segregation for their protection rather than as a direct result of their own wrong-doing, this does not mean that they are harmless. Rather, as the magistrate judge found, these Inmates have violent pasts, and remain a possible risk to each other.

We find nothing unreasonable nor exaggerated in limiting the type of personal property in administrative segregation cells, because this prevents the creation and transportation of weapons by administrative segregation inmates. We find nothing unreasonable nor exaggerated in limiting the amount of personal property in administrative segregation cells, because this enables JCCC officials to more effectively search the cells for contraband and weapons. In the aggregate, these regulations help ensure the safety and security of both inmates and staff at the JCCC, and are reasonable.[10] Because these limitations on the Inmates are reasonable, the Inmates' right to equal protection has not been violated. Because the district court erred, as a matter of law, in holding that a constitutional violation occurred, it abused its discretion in granting injunctive relief. See International Ass'n of Machinists, 850 F.2d at 374.

## IV.

Proceeding on appeal pro se, Inmate Arnold raises several additional issues.[11] First, Arnold argues that, because the district court did not specify how it had conducted its de novo review, and because the district court did not make specific reference to Arnold's pro se written exceptions, the district court committed reversible error by failing to conduct a de novo review of the magistrate judge's Reports and Recommendations.

A district court must make a de novo review of a magistrate judge's report and recommendation upon a party's written exceptions, see 28 U.S.C. § 636(b)(1). We presume that the

---

[10]Similarly, restrictions on the Inmates' access to prison resources and the requirement that they be handcuffed while out of their cells are, as found by the district court, reasonable.

[11]Arnold has also moved this Court to supplement the record in these proceedings with affidavits from inmates incarcerated in another Missouri prison. We deny the motion.

district court has made a de novo review, however, unless affirmative evidence demonstrates otherwise. Grinder v. Gammon, 73 F.3d 793, 795 (8th Cir. 1996) (per curiam) (quoting United States v. Hamell, 931 F.2d 466, 468 (8th Cir.), cert. denied, 502 U.S. 928 (1991)). The district court affirmatively stated that it had made such a review, see Order of Jan. 26, 1994, at 3; Order of Sept. 7, 1994, at 1, and Arnold has presented no evidence that the district court failed to make a proper de novo review in this case. Arnold's first claim of error is therefore denied.

Arnold also claims that the district court improperly granted the JCCC officials qualified immunity for an alleged violation of his Eighth Amendment right to be free from cruel and unusual punishment. Arnold alleges that defendants violated the Eighth Amendment by offering him only three hours of exercise per week in an enclosed area out-of-doors.[12] A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened." Whishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992). To prevail on his claim, Arnold "had to show that the prison officials were deliberately indifferent to his exercise needs." Id. at 448-49.

While not permitting inhumane conditions, "[t]he Constitution does not mandate comfortable prisons . . . " Brown v. Nix, 33 F.3d 951, 955 (8th Cir. 1994). Requiring an inmate to exercise in an enclosed area is not itself a per se violation of the Eighth Amendment, see, e.g., Peterkin v. Jeffes, 855 F.2d 1021, 1031-32 (3d Cir. 1988), nor does a limitation of three hours per week of out-of-cell exercise necessarily violate the Constitution. See Whishon, 978 F.2d at 449 (forty-five minutes of exercise per week not constitutionally infirm). Arnold stated in his complaint that

---

[12]Arnold alleges that he is limited to a "dog-run" exercise area that is 3 feet wide by 20 feet long by 7 feet high. Arnold does not allege that he is physically unable to exercise in this area.

he refused to make use of the exercise opportunities that have been provided to him, see Arnold Compl., Count II, ¶ 32, and any ill effects arising from lack of exercise stem from his own, rather than defendants', actions or inactions.  Cf. Whishon, 978 F.2d at 449 (noting that plaintiff had failed to use all the recreation time available to him).  In light of this, we cannot say that the district court erred in ruling in favor of the JCCC officials on this issue.[13]

**V.**

We affirm the district court's grant of qualified immunity to defendants and its denial of injunctive relief unrelated to in-cell personal property.  We reverse its grant of injunctive relief.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[13]Arnold also claims that JCCC officials were improperly granted qualified immunity on the Inmates' claims for damages, because the defendants had violated a clearly established constitutional right.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982) (standard for qualified immunity).  Because we hold that the JCCC officials did not violate any of the Inmates' constitutional rights, clearly established or otherwise, this issue is without merit.

-17-